# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60223

United States Court of Appeals
Fifth Circuit

**FILED**

March 6, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

TERRY THOMAS BROWN,

Defendant – Appellant

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:11-CR-113-1

Before KING, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Terry Thomas Brown challenges the district court's denial of his motion to suppress. For the following reasons, we AFFIRM the judgment of the district court.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Terry Thomas Brown, together with co-defendant Anthony D. Jones, was charged by indictment with four counts of aiding and abetting the passing of

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

counterfeit $100 bills. Brown moved to suppress evidence obtained as the result of an unlawful arrest. Specifically, Brown seeks to suppress incriminating statements he made to a Secret Service special agent while he was in detention.

The district court held an evidentiary hearing on Brown's motion and a similar motion filed by Jones. At the hearing, Chip Benjamin, a police officer with the City of Tupelo, Mississippi, testified that on July 30, 2011, he received a dispatch call to a residence, where he spoke with Kasi Guyton about her receipt of a counterfeit $100 bill at her yard sale. Benjamin arrived at Guyton's home within ten minutes of the call and possibly "less than five minutes" after the call. Guyton reported that a black male accompanied by a white male had given her the money, which she discovered was counterfeit when she went to a nearby store to try to get change. The employees at the store identified the bill as counterfeit by using a marker pen. Guyton told Officer Benjamin that the black male had given her the bill.

Officer Benjamin testified that Guyton said the men were driving "a newer model silver Toyota four-door truck with Florida [license] plates." She stated that the black male was wearing a green shirt and blue jeans. During the conversation, a truck matching Guyton's description drove by. Officer Benjamin asked Guyton if the truck that drove by looked like the one the men were in, and she responded affirmatively. Officer Benjamin immediately returned to his patrol car and followed the truck. Officer Benjamin could tell that the vehicle matched the make, model, and color of the truck described by Guyton, and when he caught up to it he saw that it had Florida license plates.

Officer Benjamin observed the vehicle turn into a gas station, and he followed. When Officer Benjamin pulled into the gas station, the black male was in the driver's seat of the vehicle and the white male was "standing outside the [passenger] door." Officer Benjamin activated his patrol car's blue lights

No. 13-60223

as he pulled into the station. The white male looked directly at Officer Benjamin's patrol car and the flashing lights.[1]  He then "hurriedly tr[ied] to get in the [convenience] store" located at the gas station.  Officer Benjamin instructed him to "get back in the truck," but the man did not heed the instruction.  Officer Benjamin exited his vehicle, pulled his service weapon, and again ordered the man back to the truck, at which point he complied.[2] Officer Benjamin testified that when the man returned to the vehicle, Officer Benjamin noticed open beer cans on the floorboard of the vehicle's passenger side.[3]  He ordered both men to place their hands on the dashboard.

Officer Benjamin obtained both men's driver's licenses and told the driver the reason for the stop.  In the courtroom, he identified Jones as the driver of the vehicle and Brown as the passenger.  Officer Benjamin testified that when he spoke with Jones at the gas station, Jones was wearing clothing matching the description given by Guyton.  Officer Benjamin informed Jones that he was suspected of passing counterfeit money, and asked Jones several questions about where he was coming from and why he was in Tupelo.  Jones explained that he was driving from Alabama to Tennessee to pick up his daughter.  Officer Benjamin testified that Jones's story "didn't make sense" to him.

---

[1] Our review of the patrol car's video from the incident confirms this order of events.

[2] The video indicates that Officer Benjamin ordered Brown to return to the vehicle four times before drawing his service weapon.

[3] By ordinance in the City of Tupelo, consuming or opening a container of beer is restricted to certain designated areas, and "[n]o beer shall be open or in the possession of any person in automobiles at any time on public property, streets or highways."  Tupelo, Miss., Code of Ordinances § 5-18(a)(1) (2003).  Violation of the ordinance is punishable by a fine not exceeding $1,000, imprisonment not exceeding ninety days, or both.  *Id*. § 1-8.

Officer Benjamin's police report did not mention the open containers.  He testified at the hearing that "[t]he Tupelo detectives did not like us to mix felony and misdemeanor charges . . . so we charged [Jones and Brown] with the felony charge of counterfeiting."

3

Guyton then arrived at the scene. Officer Benjamin had not asked her to follow him; she came to the gas station on her own initiative. She identified Jones as "the guy" who gave her the counterfeit bill, and told Jones, "[y]ou gave me a fake hundred-dollar bill." Jones responded that he did not know the bill was counterfeit and he would "make it right." Officer Benjamin then removed Jones from the truck and had him place his hands on the vehicle. Officer Benjamin checked Jones's pockets and found a counterfeit $100 bill, at which point Officer Benjamin handcuffed Jones and placed him under arrest. During a search of Jones's vehicle, officers found another counterfeit bill in Jones's wallet, which was on the driver's seat; a large sum of counterfeit money in the passenger side door; and another large counterfeit sum in a book in the back seat. There was also a computer printout of yard sale locations in the Tupelo area. Legitimate money was found separate from the counterfeit bills, in the driver's side door. Items that appeared to be from yard sales were in the bed of the truck.[4]

A second officer, Clay Hassell, arrived at the scene and took Brown into custody while Officer Benjamin spoke with Jones. Officer Hassell patted down Brown and did not find any counterfeit bills on him. When a third officer, Nathan Sheffield, arrived, he escorted Brown to Officer Benjamin's vehicle. Officer Sheffield testified at the hearing that he noticed the smell of alcohol on Brown's breath and person. Officer Sheffield also testified that he noticed open containers of alcohol on the floorboard of the vehicle's passenger side.

Officer Benjamin stated that Jones did not commit a traffic violation. He testified that Guyton did not provide any information about the clothing worn

---

[4] It is not clear whether Officer Benjamin saw the yard sale items before or after he placed Jones and Brown under arrest. At the hearing, he testified that he saw the items after arresting Jones and Brown. In the police report, he stated that he noted the items when he first spoke with Jones, before placing Jones under arrest.

by the white male accompanying Jones, and she did not speak with Brown when she arrived at the gas station. Officer Benjamin had no information at the time of the stop that Brown was in possession of counterfeit money. Officer Benjamin stated that at the time Brown returned to the vehicle, he was being detained, and that "[t]he open containers and the smell of alcohol on him" were the reasons for his detention.

The district court denied both defendants' motions to suppress in an oral order three weeks after the hearing on the motion. It found that Guyton had described "the persons" that had paid her with the counterfeit bills, that Brown was the passenger in the truck, and that he had "almost immediately exited the truck and attempted to walk into the convenience store." The court noted that when Guyton arrived at the scene, she said to "one or both defendants, '[y]ou gave me a fake 100-dollar bill.'" The court stated that Jones replied "that he did not know it was fake, 'I will make it right,'" which was "indicative to the [c]ourt that Jones and the other occupant, Brown, were aware that the currency passed at the yard sale was counterfeit currency." The court found that Officer Benjamin frisked both defendants and that "counterfeit money was found on their person," as well as within the vehicle.

The court performed a two-tiered reasonable suspicion analysis under *Terry v. Ohio*, 392 U.S. 1 (1968), as articulated in *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). "[C]onsidering the totality of the circumstances," it determined that Officer Benjamin's actions in immediately following the truck were justified at their inception. The court concluded that the ensuing

> search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place, considering the location of the yard sale items in the back of the truck and the acknowledgement of finding the counterfeit bills in the vehicle and on the persons of Jones and Brown, and also in light of the responses made by Jones, the driver of the truck, that he did not know that the bills were fake and that he would make them right.

5

"Considering the totality of all of the facts encountered or confronted by this officer," it found that the motion to suppress should be denied. Although Brown's motion to suppress was "predicated upon his arrest being without probable cause," the district court did not expressly address probable cause.

Following the denial of his motion, Brown entered a conditional guilty plea to one count of aiding and abetting the passing of a counterfeit bill, reserving his right to challenge the ruling on his motion to suppress. The district court sentenced Brown to twenty-four months' imprisonment and a three-year term of supervised release. Brown was also ordered to pay $100 in restitution. Brown filed a timely notice of appeal.

## II.    STANDARD OF REVIEW

"To assess a district court's ruling on a motion to suppress evidence under the Fourth Amendment, we review its factual determinations for clear error and the ultimate Fourth Amendment conclusions de novo." *United States v. Brigham*, 382 F.3d 500, 506 n.2 (5th Cir. 2004) (en banc) (citing *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003)). "Factual findings are clearly erroneous only if a review of the record leaves this Court with a definite and firm conviction that a mistake has been committed." *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009) (internal quotation marks and citation omitted). The district court's ruling should be upheld "if there is any reasonable view of the evidence to support it," *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (quoting *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999)), and the reviewing court "can affirm the lower court's decision on any grounds supported by the record," *United States v. McSween*, 53 F.3d 684, 687 n.3 (5th Cir. 1995).

## III.    APPLICABLE LAW

Pursuant to *Terry*, 392 U.S. 1, "[p]olice officers may briefly detain individuals on the street, even though there is no probable cause to arrest

them, if they have a reasonable suspicion that criminal activity is afoot." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc). To determine whether such an investigatory stop was legal, the court first examines "whether the officer's action was justified at its inception, and then inquires whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506 (citing *Terry*, 392 U.S. at 19–20). "Reasonable suspicion requires less information and certainty than the probable cause needed to make an arrest." *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008). "Whether an officer has reasonable suspicion to stop is answered from the facts known to the officer at the time." *Id.* Courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). The court "looks at all circumstances together to weigh not the individual layers, but the laminated total." *United States v. Olivares-Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011).

"It is well established that under the Fourth Amendment a warrantless arrest must be based on probable cause." *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013) (quoting *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc) (per curiam)). Probable cause for an arrest made without a warrant "exists when the totality of facts and circumstances within an officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed an offense." *United States v. Hebert*, 131 F.3d 514, 524 (5th Cir. 1997). The probable cause standard "requires substantially less evidence than that sufficient to support a conviction." *United States v. Ho*, 94 F.3d 932, 936 (5th Cir. 1996) (internal quotation marks and citation omitted).

No. 13-60223

Passing counterfeit currency with intent to defraud is a crime in violation of 18 U.S.C. § 472.[5] "Generally, probable cause to arrest for the offense of passing a counterfeit note is established by circumstances showing the passing of a counterfeit note coupled with an identification of the individual who passed the note." *United States v. Hernandez*, 825 F.2d 846, 849 (5th Cir. 1987); *see also United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001) ("An ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally sufficient to supply probable cause to stop the suspect.").

"[R]easonable suspicion may 'ripen' or 'develop' into probable cause for an arrest if a *Terry* stop reveals further evidence of criminal conduct." *Scroggins*, 599 F.3d at 441. "Of particular significance in those cases in which the available description is alone sufficient for a stopping for investigation, is the possibility that it may develop into probable cause for arrest as a consequence of what the police see or hear during the detention." WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.4(c) (5th ed. 2012).

## IV.    MOTION TO SUPPRESS

This case requires us to determine, first, whether a police officer had reasonable suspicion to perform an investigatory stop and, second, whether his reasonable suspicion ripened into probable cause during the course of the stop. We find in the affirmative on both questions. Accordingly, we affirm the district court's denial of Brown's motion to suppress.

---

[5] Section 472 provides:

Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 472 (2013).

## A. *Terry* Analysis

Officer Benjamin's investigatory stop was justified at its inception because he had reasonable suspicion that criminal activity had occurred. *See Michelletti*, 13 F.3d at 840. The record shows that police received a phone call from Guyton regarding counterfeit money she received at a yard sale, and Guyton informed Officer Benjamin that a store clerk had identified the bill as counterfeit. Officer Benjamin had a particularized and objective basis to believe that the individuals in the vehicle he followed were involved in the crime. *See Vickers*, 540 F.3d at 361. Guyton described the physical appearance of the man who gave her the bill, and said he was accompanied by a white male. She described the vehicle in which they were riding. When a truck matching Guyton's description drove by, Guyton identified it as "look[ing] just like" the truck the men were in. When Officer Benjamin followed the truck, he determined that it matched the make, model, and color of the vehicle described by Guyton, and had Florida license plates.

Brown suggests that because "[t]he truck was not in operation, and [Brown] was not in the truck at the time he was detained," there was no reasonable suspicion to stop him, as opposed to his co-defendant, Jones. We disagree. Officer Benjamin knew that a white male accompanied the male who passed the counterfeit bill. The testimony reveals that Brown was "standing outside the [passenger] door" when Officer Benjamin pulled in behind the pickup truck, and that he "hurriedly tr[ied] to get in the [convenience] store." The police video shows Brown standing outside the truck's passenger side, with the door open, and closing the door as Officer Benjamin pulls up behind the truck. This record is sufficient for us to conclude that Officer Benjamin had reasonable suspicion to include Brown in the scope of his investigatory stop.

Under the second prong of the *Terry* analysis, the question is whether Officer Benjamin's actions "were reasonably related to the circumstances that

justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507. We conclude that they were.

Brown argues that Officer Benjamin's "show of force and authority," in drawing his service weapon, "left [Brown] no choice but compliance" and therefore constituted "a *de facto* warrantless arrest of a citizen without probable cause." We construe this argument to suggest that Officer Benjamin's actions exceeded the permissible scope of a *Terry* stop. The government contends that Officer Benjamin's "actions of ordering Brown back into the truck were reasonable in the course of an investigative detention, and did not amount to a full blown arrest." The government explains that the actions "were clearly reasonably related to the circumstance[s] that justified the stop."

Even assuming there was no probable cause to arrest Brown when Officer Benjamin drew his service weapon, his actions did not exceed the scope of the stop under *Terry*. Officer Benjamin had reasonable suspicion to believe that Brown had been involved in criminal activity. Brown disobeyed Officer Benjamin's order, delivered four times, to return to the vehicle. Given these circumstances, Officer Benjamin's actions in drawing his service weapon were reasonably related to the circumstances justifying the stop. *See, e.g.*, *United States v. Abdo*, 733 F.3d 562, 566 (5th Cir. 2013) (holding that stop "was a proper investigatory detention" where officer drew his weapon, ordered defendant to halt, and placed defendant in handcuffs inside a patrol car); *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993) ("[U]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigative detention into an arrest requiring probable cause."). "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to

simply shrug his shoulders and allow a crime to occur or a criminal to escape."
*Vickers*, 540 F.3d at 361 (quoting *Adams v. Williams*, 407 U.S. 143, 145 (1972)).

In sum, reasonable suspicion existed to believe that Brown was involved in a recently completed crime of passing of counterfeit money, which gave Officer Benjamin the right to stop him. Officer Benjamin did not exceed the permissible scope of the stop when he drew his service weapon.

**B. Probable Cause**

We conclude that the laminated total of the evidence was more than sufficient to cause Officer Benjamin's reasonable suspicion to ripen into probable cause during the course of the investigatory stop. *See United States v. Harlan*, 35 F.3d 176, 179 (5th Cir. 1994); *Scroggins*, 599 F.3d at 441.

Officer Benjamin knew that counterfeit bills had been passed. He followed a vehicle identified by Guyton, and the vehicle matched the make, model, and color of the truck described by Guyton, and had Florida license plates. Brown walked away from Officer Benjamin, despite seeing that the patrol car's lights were activated, and despite Officer Benjamin's multiple orders to return to the truck. Finally, Officer Benjamin testified at the suppression hearing that he saw open beer cans on the floorboard of the passenger side of the vehicle when Brown returned to the vehicle. The presence of an open beer container in a vehicle is a violation of Tupelo city ordinances, *see* Tupelo, Miss., Code of Ordinances § 5-18, which Officer Benjamin testified is an arrestable offense. While none of these factors alone may have been sufficient to create probable cause, the laminated total was more than sufficient. *See Olivares-Pacheco*, 633 F.3d at 402.

The fact pattern here is analogous to that in *United States v. Rice*, 652 F.2d 521 (5th Cir. Unit A Aug. 1981). In *Rice*, the court also found probable cause to arrest an individual who did not actively participate in passing a counterfeit bill, but was with someone who did, when that individual took

11

independent actions that led the police officer to believe the individual "might be involved [with] or at least ha[ve] some knowledge of [his associate's] illegal activity." *Id.* at 525. In *Rice*, defendants Rice and Williford, accompanied by a third individual who was never identified, entered a drug store in a mall, where Rice paid the sales clerk using a counterfeit twenty-dollar bill, while Williford stood at the magazine rack. *Id.* at 523. After the men left, the clerk concluded the bill was counterfeit, notified the manager, and called the police. *Id.* at 523–24. The clerk and the manager went into the mall to see if they could identify the suspects. *Id.* at 524. The clerk was able to indicate Rice and Williford to the manager, after which she returned to the store. *Id.* When a police officer arrived, the manager identified Rice and Williford to him. *Id.* The officer approached the men and asked them for identification; they were evasive, and their answers raised the officer's suspicions. *Id.* After the officer obtained identification from the men, the store manager again "pointed out Rice as the man who had passed the bill to the clerk." *Id.* The officer arrested both men. *Id.* While Williford was being handcuffed, he dropped his wallet, which the officer retrieved. *Id.* The officer found two counterfeit bills in the wallet. *Id.*

Rice and Williford challenged the validity of their arrests for lack of probable cause. The court concluded that there was sufficient probable cause to support the arrest of both men, even though Williford "did not actively participate in passing the bill[.]" *Id.* at 525. The court explained:

When viewed in totality, not a vacuum, we find the officer had before him information that (i) three men had passed a counterfeit bill at Skillern's Drug Store, (ii) Williford was with Rice, (iii) they both were reluctant to identify themselves on the officer's request, initially only giving their first names, (iv) both denied possessing any identification, (v) it was only on his specific notice of the wallet in Williford's pocket and repeated request for identification that Williford produced the driver's license which bore another name and picture, and (vi) the bill Rice was charged with passing was indeed

counterfeit. . . . Williford's action in seeking to (i) hide his true identity, (ii) evade giving even his last name, and (iii) avoid giving identification until the officer spotted his wallet, when combined with the other factors, establish the officer had probable cause to arrest him.

*Id.*

Here, Brown took independent actions, like Williford in *Rice*, that suggested he was more than a mere bystander to a co-defendant's criminal actions. A review of the police surveillance video of the stop reveals that Brown walked away from Officer Benjamin, despite the fact that Officer Benjamin had activated the blue lights on his patrol car immediately after pulling in behind Brown and Jones's truck. Moreover, Brown continued walking towards the convenience store despite multiple orders from Officer Benjamin to return to the truck. In *Rice*, Williford hid his true identity, evaded giving his last name, and avoided giving identification to the police officer. *Id.* The court said that those actions could reasonably lead the officer to believe that Williford "might be involved [with] or at least ha[ve] some knowledge of [his associate's] illegal activity." *Id.* Similarly, Brown's actions in avoiding Officer Benjamin reasonably suggested that he might be involved with the crime of passing counterfeit money or have some knowledge of the crime. Other courts have found probable cause in similar situations.[6]

---

[6] *See Hernandez*, 825 F.2d at 849 (finding probable cause to arrest two men where carnival vendor had described both men, only one of whom had tried to pass a counterfeit bill, and police officers had subsequently found the defendant and his co-defendant a short time later at the carnival and the men matched the vendor's description); *see also United States v. Nash*, 946 F.2d 679, 681 (9th Cir. 1991) (finding probable cause where store clerk called police to report a man fitting the description of a robber broadcast over the radio, and when police approached the cab in which the man was sitting, "he exited the cab and attempted to leave the scene," but "was stopped by police, who determined that he matched the description given with the exception of clothing color"); *United States v. Hill*, 340 F. Supp. 344, 348 (E.D. Pa. 1972) (finding probable cause to arrest passengers in rear seat of car, when only the individual in the front seat appeared to have engaged in an illegal transaction, explaining that the fact that the passengers "left the rear seat" and "started to walk away," when "taken with the surrounding facts indicates enough guilty knowledge of the transaction

No. 13-60223

Brown argues that *Rice* is distinguishable because Williford was evasive about his identity whereas Brown was not. This argument is unpersuasive. The relevance of *Rice* is that a defendant's actions raised suspicion that he was more than a bystander to his co-defendant's illegal activity, i.e., that he was involved with or knew of the illegal activity. Brown's actions in ignoring the patrol car's flashing lights and disobeying Officer Benjamin's orders did precisely that.

Likewise, Brown's argument that "a person's presence at the scene of an offense and association with persons connected to an offense are insufficient to establish probable cause" is unavailing. We do not find probable cause solely because of Brown's presence, although that is one layer we consider in the laminated total. *See Olivares-Pacheco*, 633 F.3d at 402; *Harlan*, 35 F.3d at 179. Brown engaged in independent actions that reasonably raised Officer Benjamin's suspicions, and Officer Benjamin saw open beer containers on Brown's side of the vehicle, in violation of local law. Taken together, these factors establish probable cause.

For these reasons, we conclude that Officer Benjamin's reasonable suspicion ripened into probable cause to arrest Brown.

## V.    ERRORS IN DISTRICT COURT'S FACTUAL FINDINGS

Brown contends that the district court's ruling contained several factual errors that constitute clear error, and therefore warrant reversal. Specifically,

---

to overcome any presumption that they were merely innocent passengers, and in the Court's opinion established probable cause for their arrest likewise"); *Matter of E.G.*, 482 A.2d 1243, 1247 (D.C. 1984) (finding probable cause where suspect matched complainant's description and refused officer's order to halt; the court explained that "the strong correlation between appellant's appearance and the description possessed by [the officer], together with appellant's proximity to the crime scene and his behavior when confronted with a police order to halt, tips the scales here in favor of probable cause"); LAFAVE, SEARCH AND SEIZURE § 3.4(c) (explaining that "if the officer attempts a lawful stop but the suspect 'refused to stop when initially ordered to do so,' this may also be taken into account" in the probable cause analysis).

he challenges the district court's findings that: (1) counterfeit money was found "in the vehicle and on the persons of Jones and Brown"; (2) Guyton "provided a description of the persons that were offering the counterfeit bills"; (3) Brown was a passenger in the truck and "almost immediately exited the truck and attempted to walk into the convenience store"; (4) and Guyton told "one or both or both defendants, 'You gave me a fake 100-dollar bill.'" Brown also argues that the district court committed clear error when it stated that Jones's response to Guyton, that he "will make it right," was "indicative to the [c]ourt that Jones and the other occupant, Brown, were aware that the currency passed at the yard sale was counterfeit currency."

We conclude that the district court's first finding constitutes clear error, since there was no testimony that counterfeit money was found on Brown's person. However, the district court's erroneous finding does not alter our *Terry* or probable cause analyses, since there was sufficient evidence to reach our conclusions absent the error. Therefore, the court's finding does not affect Brown's substantial rights, and is harmless error. Fed. R. Crim. P. 52; *see United States v. Hughes*, 726 F.3d 656, 668 (5th Cir. 2013).

The district court's other findings are not clearly erroneous. Guyton provided a description of both Jones and Brown, and their vehicle, that was sufficient for Officer Benjamin to identify them. The fact that Guyton's description of Brown was less specific than her description of Jones is not material; Brown was found accompanying Jones and in the vehicle that Guyton described. The court's finding that Brown was a passenger in the vehicle and attempted to enter the convenience store is supported by the record and the patrol car's video. The court's finding that Guyton informed "one or both defendants" of the counterfeit bill is likewise not erroneous, since the record reveals that she made her statement to Jones.

15

Finally, the court did not commit clear error when it suggested that Jones's statement was indicative of Brown's guilt.  Since Guyton's information implicated both defendants, and Brown's independent actions reasonably raised Officer Benjamin's suspicions, there is a "reasonable view of the evidence [] support[ing]" the district court's statement.  *See Scroggins*, 599 F.3d at 440.  Moreover, even if the court's statement were clearly erroneous, it would not change our *Terry* or probable cause analyses, since there was sufficient evidence to reach our conclusions without consideration of Jones's statement.

## VI.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.